**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> PANGANG GROUP COMPANY, LTD.; PANGANG GROUP STEEL VANADIUM & TITANIUM COMPANY, LTD.; PANGANG GROUP TITANIUM INDUSTRY COMPANY, LTD.; PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING COMPANY, *Defendants-Appellants.* | No. 19-10306 <br><br> D.C. Nos. <br> 4:11-cr-00573-JSW-7 <br> 4:11-cr-00573-JSW-8 <br> 4:11-cr-00573-JSW-9 <br> 4:11-cr-00573-JSW-10 <br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted October 15, 2020
San Francisco, California

Filed July 26, 2021

2   UNITED STATES V. PANGANG GROUP

Before: Kim McLane Wardlaw and Daniel P. Collins,
Circuit Judges, and Richard K. Eaton,* Judge.

Opinion by Judge Collins

---

### SUMMARY**

---

### Criminal Law

The panel affirmed the district court's denial of a motion by four affiliated Chinese companies to dismiss an indictment charging violations of the criminal provisions of the Economic Espionage Act.

The companies argued that they are "instrumentalities" of the government of the People's Republic of China (PRC) and are therefore entitled to sovereign immunity under the Foreign Sovereign Immunities Act (FSIA). The district court denied the motion on the grounds that, even assuming that the FSIA's immunity provisions extend to criminal cases, the companies were not immune in light of the FSIA's commercial activity exception and its waiver exception.

Regarding the Government's challenges to appellate jurisdiction, the panel perceived no basis for departing from the well-settled caselaw allowing immediate appeals, under the collateral order doctrine, from a denial of foreign

---

* Richard K. Eaton, Judge of the United States Court of International Trade, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

sovereign immunity, and rejected the Government's suggestion that the appeal is unripe.

The panel did not need to reach the issues of whether and to what extent the immunity conferred by the FSIA applies in criminal cases. The panel concluded, rather, that in moving to dismiss the indictment, the companies failed to carry their burden to make a prima facie showing that they are instrumentalities of a foreign sovereign within the meaning of the FSIA. The panel explained that the allegations of the indictment, standing alone, are insufficient to establish that the companies were instrumentalities of the PRC on the date they were indicted; and that because the companies relied solely upon the indictment's allegations, and presented no evidence to support their motions to dismiss, they necessarily failed to establish a prima facie case that they are "foreign state[s]" entitled to immunity under § 1604 of the FSIA.

## COUNSEL

John M. Potter (argued), Quinn Emanuel Urquhart & Sullivan LLP, San Francisco, California; Robert P. Feldman and Andrew P. March, Quinn Emanuel Urquhart & Sullivan LLP, Redwood Shores, California; William B. Adams, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; for Defendants-Appellants.

Matthew M. Yelovich (argued), Assistant United States Attorney; Merry Jean Chan, Chief, Appellate Section, Criminal Division; David L. Anderson, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

**OPINION**

COLLINS, Circuit Judge:

Defendants-Appellants Pangang Group Company, Ltd. ("PGC"); Pangang Group Steel Vanadium & Titanium Company, Ltd. ("PGSVTC"); Pangang Group Titanium Industry Company, Ltd. ("PGTIC"); and Pangang Group International Economic & Trading Company ("PGIETC") (collectively, "the Pangang Companies") are four affiliated Chinese companies that have been indicted for violating the criminal provisions of the Economic Espionage Act ("EEA"), 18 U.S.C. § 1831 *et seq.* The Pangang Companies moved to dismiss the indictment, arguing that they are "instrumentalities" of the government of the People's Republic of China ("PRC") and are therefore entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* The district court denied the motion on the grounds that, even assuming that the FSIA's immunity provisions extend to criminal cases, the Pangang Companies were not immune in light of the FSIA's commercial activity exception and its waiver exception.

The Pangang Companies have filed this immediate appeal from the denial of their motion to dismiss, and the parties' briefs in this court sharply disagree as to whether and to what extent the immunity conferred by the FSIA applies in criminal cases. We need not reach these issues, however, because we conclude that, in moving to dismiss the indictment, the Pangang Companies failed to carry their burden to make a prima facie showing that they are instrumentalities of a foreign sovereign within the meaning of the FSIA. We therefore affirm the district court's denial of the motion.

# I

## A

Because Appellants' motion to dismiss asserted a facial challenge to the operative indictment, *see infra* at 13–14, we take the following allegations of the indictment as true for purposes of this appeal.  *See United States v. Fiander*, 547 F.3d 1036, 1041 n.3 (9th Cir. 2008).

Titanium dioxide ("$TiO_2$") is a white pigment that is used in products "ranging from paints to plastics to paper."  As the Chinese economy grew in the 1990s, demand for $TiO_2$ increased, but no company within China had been able to develop a "clean, efficient" technology for producing it.  E.I. du Pont de Nemours & Company ("DuPont") had managed to successfully develop such a process "through intensive research and development over many years," but DuPont was unwilling to sell or license that technology to Chinese companies.  DuPont's "chloride-route" $TiO_2$ production technology included multiple trade secrets that DuPont took extensive efforts to keep confidential.

Because of $TiO_2$'s importance to manufacturing, officials of the Chinese government decided to task Walter Liew, a U.S. businessman, with obtaining and transferring DuPont's "chloride-route $TiO_2$ technology" to China through other means.  Liew endeavored to do so by "assembl[ing] a team that included former DuPont employees," including one with "detailed knowledge of DuPont's $TiO_2$ technology" and "expertise in building $TiO_2$ production lines."  As a result of the efforts of Liew and others, certain DuPont trade secrets were unlawfully transferred to the Pangang Companies.  In "a line of effort parallel" to Liew's activities, the Pangang Companies also arranged with unknown "computer hackers" to access

DuPont computers without authorization and to steal "trade secret information related to the chloride-route production of $TiO_2$."

## B

Liew was ultimately indicted and convicted on multiple federal charges arising from his efforts to obtain DuPont's trade secrets, and he was sentenced to 144 months in prison. *See United States v. Liew*, 466 F. Supp. 3d 1062, 1063 (N.D. Cal. 2020). In 2012, the Pangang Companies were added as co-defendants in a superseding indictment in Liew's case. The operative pleading against them is the Third Superseding Indictment, which the Government sought and filed in 2016 after Liew had already been tried before a jury and convicted.

The indictment charges the Pangang Companies with one count of conspiring to commit economic espionage for the benefit of a foreign government or instrumentality in violation of 18 U.S.C. § 1831(a)(5) and one count of attempting to commit such economic espionage in violation of § 1831(a)(4). As to the first count, the indictment alleges that the Pangang Companies conspired with Liew and others, *inter alia*, to steal DuPont trade secrets in violation of § 1831(a)(1); to copy and convey such trade secrets without authorization in violation of § 1831(a)(2); and to receive, buy, and possess such trade secrets, knowing they had been obtained without authorization, in violation of § 1831(a)(3). The second count alleges that the Pangang Companies attempted to commit the same three offenses that were the objects of the conspiracy. Under the terms of the statute, the offenses must have been committed with knowledge that they "will benefit any foreign government, foreign instrumentality, or foreign agent." *Id.* § 1831(a). The indictment alleges that this requirement is satisfied

because the charged offenses "would benefit a foreign government, namely the PRC, and foreign instrumentalities, namely [PGC], PGSVTC, [PGTIC], and P[G]IETC."

## C

After the Pangang Companies were named as co-defendants in 2012, they repeatedly and successfully argued that the Government's efforts to serve summonses on the indictment were inadequate under Federal Rule of Criminal Procedure 4. Partly in response to the district court's rulings in this case, Rule 4 was formally amended, effective December 1, 2016, so as to clarify the requirements for serving foreign organizational defendants. *See In re Pangang Grp. Co.*, 901 F.3d 1046, 1050–53 (9th Cir. 2018). The Government thereafter again attempted service, and the district court upheld that service as valid under the amended rule. *Id*. at 1054. We denied the Pangang Companies' ensuing mandamus petition, concluding that, in light of the amendments to Rule 4, "the district court did not err, let alone clearly err, in denying the Pangang Companies' motion to quash service." *Id*. at 1060.

The Pangang Companies pleaded not guilty in September 2018, and the following July they moved to dismiss the indictment for lack of jurisdiction and for failure to state an offense. *See* Fed. R. Crim. P. 12(b)(2), (3)(B)(v). In contesting the court's subject matter jurisdiction, the Pangang Companies asserted that (1) under the allegations of the operative indictment, they were all "instrumentalities" of the PRC for purposes of the FSIA; (2) the FSIA's general rule that instrumentalities of a foreign sovereign are "immune from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604, applies in criminal cases; and (3) the FSIA's exceptions to that

immunity apply only in *civil* cases. After briefing and argument, the district court denied the motion.

For purposes of its ruling, the district court assumed that the indictment's allegation that the Pangang Companies were "foreign instrumentalit[ies]" under the EEA, 18 U.S.C. § 1839(1), was sufficient to establish that they were also "agenc[ies] or instrumentalit[ies] of a foreign state" entitled to immunity under the FSIA, 28 U.S.C. § 1603(a). The court noted that there were some differences between the FSIA's definition of that latter phrase and the EEA's definition of a "foreign instrumentality," but the court concluded that those differences were "not material." The court extensively surveyed the caselaw addressing whether the FSIA applies to criminal cases, but it ultimately concluded that it did not need to definitively resolve this issue. Even "assuming the FSIA applies in criminal cases," the court explained, "its exceptions apply as well." Turning to the specific exceptions invoked by the Government in opposing the motion to dismiss, the court held that the Pangang Companies' conduct fell within the commercial activity exception, *see* 28 U.S.C. § 1605(a)(2), and that their litigation conduct triggered the waiver exception, *id.* § 1605(a)(1).

The Pangang Companies timely filed a notice of appeal.

## II

The Government challenges our appellate jurisdiction over the district court's order, but we conclude that its objections lack merit.

"[W]e have long held that 'an order denying immunity under the FSIA is appealable under the collateral order doctrine.'" *Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759,

763 (9th Cir. 2007) (quoting *Compañía Mexicana de Aviación, S.A. v. U.S. Dist. Ct.*, 859 F.2d 1354, 1358 (9th Cir.1988)); *accord Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1130 (9th Cir. 2012); *cf. Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992) (addressing the merits of an interlocutory appeal in an FSIA case in which appellate jurisdiction below rested on the collateral order doctrine).[1] The Government argues that a different rule should apply in the *criminal* context, but we disagree. Even assuming that a criminal defendant invoking the collateral order doctrine must point to "an explicit statutory or constitutional guarantee that *trial will not occur*," *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989) (emphasis added); *cf. Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 875 (1994) (citing *Lauro Lines*, 490 U.S. at 499), we think that standard is satisfied here. The Pangang Companies' appeal invokes the explicit statutory immunity from jurisdiction conferred by the FSIA, which—if it applies to this criminal case—would bar the prosecution from going forward at all. We recognize that a "party's agility" in "characterizing the right asserted" as "an irreparable 'right not to stand trial'" is not dispositive and that the right must "rise to the level of importance needed for recognition under § 1291." *Digital Equip.*, 511 U.S. at 871–72, 877–79. But *this* particular claimed right—an asserted right of a foreign sovereign entity not to be criminally prosecuted in the United States—is surely one that (if it exists) meets that standard. Indeed, the Supreme Court has

---

[1] Under the collateral order doctrine, a "small class" of otherwise interlocutory rulings are deemed to be "final" and appealable if they "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498 (1989) (simplified).

stated that the asserted right of a foreign sovereign "to [be] free . . . from *suit*" is so important that a court normally should "reach a decision about immunity as near to the outset of the case as is reasonably possible." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017).

Nevertheless, the Government asserts that, even if a foreign state instrumentality would ordinarily be able to file an immediate appeal of a denial of foreign sovereign immunity, the Pangang Companies cannot do so here in light of the unique EEA backdrop to this case. According to the Government, the collateral order doctrine's requirement that the appeal involve "important questions *completely separate* from the merits," *Digital Equip.*, 511 U.S. at 867 (emphasis added), is not met here, because the question of whether the Pangang Companies qualify as "agenc[ies] or instrumentalit[ies] of a foreign state" under the FSIA happens to overlap with the merits issue of whether they are "foreign instrumentalit[ies]" under the EEA who were benefitted by the theft of trade secrets. This argument fails, because jurisdiction under the collateral order doctrine "must be determined at a higher level of generality" and does not turn on such case-specific fortuities. *Id*. at 876–77. Applying that higher level of generality, we perceive no basis for departing from the well-settled caselaw allowing immediate appeals, under the collateral order doctrine, from a denial of foreign sovereign immunity. *Cf. Bolivarian Republic*, 137 S. Ct. at 1324 (noting that, outside the context of expropriation cases, "cases in which the jurisdictional inquiry does not overlap with the elements of a plaintiff's claims have been the norm in cases arising under other exceptions to the FSIA").

We also reject the Government's suggestion that the appeal is unripe. While the question of whether the Pangang Companies are actually foreign instrumentalities under the FSIA has not been definitively resolved, that does not preclude us from deciding the claim of immunity that the district court *has* rejected—*viz.*, the Pangang Companies' argument that, *taking the allegations of the indictment as true*, they are immune under the FSIA. *See Doe v. Holy See*, 557 F.3d 1066, 1073–74 (9th Cir. 2009) (asserting appellate jurisdiction over denial of motion to dismiss in which the defendant asserted that "on the face of the complaint," it was immune under the FSIA); *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012) (applying similar standard in reviewing denial of motion to dismiss complaint at the outset based on qualified immunity). And the fact that this appeal involves a threshold question of whether the defendants qualify as instrumentalities of a foreign state does not change the jurisdictional analysis. *See Funk v. Belneftekhim*, 861 F.3d 354, 364 (2d Cir. 2017) ("[T]his court has exercised appellate jurisdiction over interlocutory denials of sovereign immunity based solely on a finding that a party is not an agency or instrumentality of a foreign state under the FSIA." (citing *Filler v. Hanvit Bank*, 378 F.3d 213, 216–17 (2d Cir. 2004)); *cf. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) (immediate appellate jurisdiction extends to denial of Eleventh Amendment immunity even when claim of immunity "presents difficult factual questions as to whether an agency is an 'arm of the State'").

## III

We therefore turn to the merits of the Pangang Companies' appeal. The companies claim that they are

immune from prosecution in this case by virtue of the terms of § 1604 of the FSIA, which provides:

> Subject to existing international agreements to which the United States is a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. The parties vigorously dispute whether this provision confers immunity from all jurisdiction, civil or criminal, or whether it instead applies only to jurisdiction over civil cases. If § 1604's immunity does apply to criminal cases, the parties further dispute whether, and to what extent, the *exceptions* to immunity listed elsewhere in the FSIA also apply in such cases. But we cannot properly reach such issues unless and until the threshold predicate for application of the FSIA is first satisfied—namely, that the party seeking to invoke the FSIA's immunity is a "foreign state" within the meaning of the FSIA. Accordingly, we begin by considering that issue. And because we find it dispositive, we do not reach or decide whether, or to what extent, the FSIA applies in criminal cases.

## A

Because we have never addressed whether the FSIA applies in criminal cases, we have never considered how the issue of foreign sovereign immunity would properly be raised or analyzed in a criminal case. We need not definitively resolve those questions here. Assuming *arguendo* that the FSIA does apply in criminal cases, we see no reason not to further assume that the same basic procedural framework that we have applied in the civil

context would also apply, *mutatis mutandis*, in the criminal context.

Under that framework, when (as here) it is "not obvious or uncontested" that the defendant is a "foreign state," *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1128 (9th Cir. 2010), the defendant seeking to assert FSIA immunity "bears the initial burden to 'make a prima facie case that it is a foreign state,'" *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1087 (9th Cir. 2018) (quoting *Peterson*, 627 F.3d at 1124). Once this prima facie case has been established, the burden shifts to the plaintiff to make a sufficient showing that an exception to the FSIA applies. *See Packsys*, 899 F.3d at 1087–88; *Terenkian*, 694 F.3d at 1131. "'If the plaintiff satisfies [this] burden of production, jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply.'" *Packsys*, 899 F.3d at 1088 (quoting *Peterson*, 627 F.3d at 1125).

In seeking to invoke this burden-shifting framework, and in asserting immunity from jurisdiction, a defendant "may make either a facial or factual challenge to the district court's subject matter jurisdiction." *Terenkian*, 694 F.3d at 1131. If the defendant makes a factual challenge, "the defendant may introduce testimony, affidavits, or other evidence to dispute the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*. (simplified). In this posture, "'no presumptive truthfulness attaches to plaintiff's allegations.'" *Id*. (quoting *Doe v. Holy See*, 557 F.3d at 1073). If the defendant makes only a facial challenge, then "we treat the challenge as 'any other motion to dismiss on the pleadings for lack of jurisdiction.'" *Id*. (quoting *Doe v. Holy See*, 557 F.3d at 1073).

In moving to dismiss the operative indictment here, the Pangang Companies raised only a facial challenge. They did not present any evidence in support of their motion, but instead relied entirely on the allegations of the indictment, which they took as true, to carry their threshold burden to establish that each of them was a "foreign state" within the meaning of the FSIA. In opposing the Pangang Companies' motion to dismiss the indictment, the Government likewise did not present any evidence, but instead relied solely on the allegations of the indictment in arguing that the immunity conferred by the FSIA was inapplicable. As framed here, the question therefore is whether the Pangang Defendants' reliance on the allegations of the indictment, taken as true, is sufficient to carry their "initial burden to 'make a prima facie case'" that they are "'foreign state[s].'" *Packsys*, 899 F.3d at 1087 (citation omitted). This raises a "question[] of law which we review *de novo*." *Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 522 (9th Cir. 2001).

**B**

Taking the allegations in the indictment as true, we conclude that the Pangang Companies failed to establish a prima facie case that they qualify as "foreign states" under the FSIA.

**1**

The immunity afforded by the FSIA applies only to a "foreign state," a phrase that § 1603 defines to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). There is no contention that the Pangang Companies are "political subdivision[s]" of the "foreign state" of the PRC, and so the only question is whether they qualify as "agenc[ies] or instrumentalit[ies] of

a foreign state as defined in subsection (b)."    That
subsection, in turn, defines that phrase to mean:

> [A]ny entity—
>
>> (1) which is a separate legal person,
>> corporate or otherwise, and
>>
>> (2) which is an organ of a foreign state
>> or political subdivision thereof, or a
>> majority of whose shares or other
>> ownership interest is owned by a foreign
>> state or political subdivision thereof, and
>>
>> (3) which is neither a citizen of a State
>> of the United States as defined in section
>> 1332(c) and (e) of this title, nor created
>> under the laws of any third country.

28 U.S.C. § 1603(b).  Because there is no dispute that the
Pangang Companies are separate corporate persons and that
they were organized under the laws of the PRC, the
requirements of § 1603(b)(1) and (b)(3) are not at issue here.
Moreover, the Pangang Companies have not contended that
they are "organ[s] of a foreign state or political subdivision
thereof."    The only question, therefore, is whether "a
majority of [each of the Pangang Companies'] shares or
other ownership interest is owned by a foreign state or
political subdivision thereof."  *Id*. § 1603(b)(2).

    The literal language of this phrase presents a threshold
question whether its use of the phrase "foreign state" is
recursive, such that it might be applied in a chain-like
fashion to reach successive layers of related entities.  Thus,
for example, if a "foreign state" owns a majority of the
shares of a separate corporation organized under its laws,

16        UNITED STATES V. PANGANG GROUP

that corporation qualifies as an "agency or instrumentality of a foreign state" under subsection (b), which means, in turn, that it is included within the definition of a "foreign state" under subsection (a). Because that corporation is thus generally treated as a "foreign state" for purposes of the FSIA, *see id*. § 1603(a), can it then be treated as a "foreign state" *in subsection (b)(2)* when determining whether *another* entity meets subsection (b)'s definition of "agency or instrumentality"? If so, that would mean that a corporation that is majority owned by *another* corporation that is majority owned by a foreign state would count as a "foreign state" that is entitled to immunity.

The problem with this reading of § 1603 is that it ignores a critical difference in language between subsection (a) and subsection (b)(2). The general definition of "foreign state" in subsection (a) provides that, as used in the FSIA, that phrase includes not only what one would ordinarily think of as the "foreign state"—*i.e.*, the foreign nation itself—but also *both* "a political subdivision of a foreign state" *and* "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). But when defining which state-owned entities are foreign "agenc[ies] or instrumentalit[ies]," subsection (b)(2) requires ownership "by a foreign state or *political subdivision* thereof," thereby conspicuously omitting the phrase "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(b)(2) (emphasis added). The difference in language must be given significance, and it precludes the above-described recursive reading. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (simplified)).

Moreover, a recursive reading would render subsection (b)(2)'s explicit reference to a "political subdivision" surplusage inasmuch as a "political subdivision" would *already* be included within the reinserted definition of "foreign state." That is a further reason why the recursive reading cannot be correct. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."). Accordingly, the statutory text makes clear that the reference to "foreign state" in subsection (b)(2) means *only* the foreign sovereign itself and not any additional entity included within the definition of "foreign state" by subsection (a).

Although its opinion did not explicitly address the recursive reading, the Supreme Court necessarily rejected that construction of subsection (b)(2) when it squarely held, in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), that a "corporation is an instrumentality of a foreign state under the FSIA *only* if the foreign state *itself* owns a majority of the corporation's shares." *Id*. at 477 (emphasis added). The Court thus construed the reference to "foreign state" in subsection (b)(2) as referring *only* to the actual "foreign state itself," *i.e.*, the foreign sovereign, and *not* to any "agency or instrumentality" of that foreign state. *Id*. Under that understanding of the statute, the defendant "Dead Sea Companies" in that case, which were indirectly owned by the State of Israel through "one or more intermediate corporate tiers," were not agencies or instrumentalities of a foreign state within the meaning of the FSIA. *Id*. at 473–77.

The Dead Sea Companies in *Dole Food* instead attempted to squeeze themselves into subsection (b)'s definition of "agency or instrumentality" by arguing for an expansive reading of the phrase "owned by a foreign state."

According to the companies, the term "owned" includes indirect ownership, at least as that term is used in "common parlance" and in its "colloquial sense." 538 U.S. at 474. The Court rejected this contention, concluding that it ignores both the language of the FSIA and the background principles of corporate law that would necessarily inform the understanding of the statute's terms. *Id*. In particular, the Court noted that subsection (b)(2) "refers to ownership of '*shares*,' showing that Congress intended statutory coverage to turn on formal corporate ownership." *Id*. (emphasis added). And although subsection (b)(2) also refers to a foreign state's owning a majority of an "ownership interest" other than "shares," that phrase was "best understood" as referring to the possibility of "ownership forms in other countries, or even in this country, that depart from conventional corporate structures." *Id*. at 476.

Accordingly, what mattered in *Dole Food* was whether Israel owned a majority of "the Dead Sea Companies as a matter of corporate law, irrespective of whether Israel could be said to have owned the Dead Sea Companies in everyday parlance." *Id*. at 474. Because the Dead Sea Companies had corporate shares, and not some other form of "ownership interest," their status turned on who owned a majority of those shares. *Id*. at 473–75 (simplified). Because "Israel did *not* own a majority of shares in the Dead Sea Companies," but instead "owned a majority of shares, at various times, in companies one or more corporate tiers *above* the Dead Sea Companies," the latter companies, as subsidiaries, were not agencies or instrumentalities of Israel. *Id*. at 475 (emphasis added). As the Court stated, "only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement," and Israel lacked such direct ownership. *Id*. at 474.

*Dole Food* also addressed the separate question of whether a defendant's status as an instrumentality should be judged as of the time of the underlying conduct or as of the time of the suit. 538 U.S. at 478–80. The Court held that, because subsection (b)(2) "is expressed in the present tense," it "requires that instrumentality status be determined at the time suit *is filed*." *Id.* at 478 (emphasis added). The Court noted that this understanding of the statute was also "consistent with the longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought." *Id.* (citations and internal quotation marks omitted). Assuming that the FSIA applies in the criminal context, this aspect of *Dole Food* would indicate that a defendant's status as an "agency or instrumentality of a foreign state" must be determined as of the time it was first indicted.

**2**

With these standards in mind, we consider whether the allegations of the indictment here are sufficient to establish that the Pangang Companies were "agenc[ies] and instrumentalit[ies] of a foreign state" within the meaning of the FSIA as of February 7, 2012, the day that they were first indicted.

**a**

The indictment includes several allegations about the ownership structure of the Pangang Companies, which we take as true for purposes of this appeal. *See supra* at 13–14. Like the other allegations of the indictment, these claims about corporate structure are alleged to be true "at all relevant times." Because the dates of the alleged conspiracy are 1998 through October 2011, at least that timeframe is included within the indictment's understanding of the

"relevant times." Although that timeframe does not expressly include the date of the indictment four months later, the latter date is close enough in time that we will assume, for purposes of argument, that the indictment's allegations concerning the companies' corporate structure on October 2011 may properly be relied upon to establish a prima facie case as to the corporate structure as of February 2012.

As to PGC, the indictment alleges that it was a "state-owned enterprise controlled by" the "State-Owned Assets Supervision and Administration Commission of the State Council (SASAC)," which is a "special government agency" of the PRC. The remaining Pangang Companies—PGSVTC, PGTIC, and PGIETC—are alleged to be direct or indirect "subsidiaries" of PGC. Specifically, the indictment states that PGC "controlled" the "subsidiar[y]" PGSVTC, "which shared senior management" with PGC. PGTIC and PGIETC were "subsidiaries" that "w[ere] owned and controlled by [PGC] and PGSVTC."

In light of these allegations, we can readily dispose of three of the four entities charged in this case. Taken as true, the allegations affirmatively *negate* the premise that PGSVTC, PGTIC, or PGIETC may be considered agencies or instrumentalities of the PRC. The indictment describes all three of these entities as being "subsidiaries" of *the fourth defendant—i.e.*, PGC. Because the corporate-law concept of a "subsidiary" refers to a company in which the parent "has a controlling share," *see Corporation—subsidiary corporation*, Black's Law Dictionary (11th ed. 2019); *see also* 1 F. Hodge O'Neal & Robert B. Thompson, Close Corporations and LLCs: Law and Practice § 1:7 (Rev. 3d ed. 2021) ("Subsidiary corporations" are those "where all or most of the stock is owned by another corporation."), the

indictment indicates that PGC is a parent corporation *between* the other three companies and SASAC. PGC, of course, is not the "foreign state itself," *Dole Food*, 538 U.S. at 477, nor is it a "political subdivision thereof," 28 U.S.C. § 1603(b)(2). Because PGSVTC, PGTIC, and PGIETC thus "were subsidiaries of [an]other corporation[]," 538 U.S. at 475, they were not *directly* owned by the PRC or SASAC, and they therefore cannot be deemed to be "agenc[ies] or instrumentalit[ies] of a foreign state" within the meaning of § 1603(b).

The indictment's allegations as to the ownership structure of PGC require a somewhat different analysis. The operative indictment alleges that, "at all times relevant," PGC was a "state-owned enterprise controlled by SASAC," a "special government agency" of the PRC. Even assuming *arguendo* that SASAC counts as a "political subdivision" of the PRC rather than an "agency or instrumentality," *cf. Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 495 F.3d 1024, 1034–36 (9th Cir. 2007) (Iranian Defense Ministry is part of the Iranian State rather than an "agency or instrumentality"), *rev'd on other grounds*, 556 U.S. 366 (2009), the indictment's allegations are insufficient to establish a prima facie case that PGC is an agency or instrumentality of SASAC.

As an initial matter, the allegation that PGC was "controlled by SASAC" is not enough. *Dole Food* explicitly rejected the proposition that, "in determining instrumentality status under the [FSIA], control may be substituted for an ownership interest." 538 U.S. at 477. The crucial question, instead, is whether a "majority of [PGC's] shares or other ownership interest is owned" by SASAC or the PRC. 28 U.S.C. § 1603(b)(2). The indictment's unadorned

allegation that PGC is "state-owned" does not resolve that issue, because it does not indicate whether that term is used merely in the "colloquial sense of that term"—which would include indirect ownership—or whether the term is instead meant to refer to "own[ing] shares . . . as a matter of corporate law." *Dole Food*, 538 U.S. at 474. The former sense of ownership is *not* sufficient to satisfy § 1603(b)(2), and direct ownership of a majority of shares is required. *See supra* at 17–18. Because the indictment's ambiguous allegation that PGC is "state-owned" glosses over this distinction, alleging nothing about ownership of *shares*, it is insufficient to establish the requisite "direct ownership of a majority of shares by the foreign state." *Dole Food*, 538 U.S. at 474.

Two other points underscore the inherent ambiguity in the indictment's use of the phrased "state-owned." First, the indictment refers to PGTIC and PGIETC as being "owned and controlled by [PGC] *and PGSVTC*," but the indictment also alleges that PGSVTC, PGTIC, and PGIETC are each "subsidiaries" of PGC (emphasis added). The indictment thus alleges that PGTIC and PGIETC are owned by two companies (PGC and PGSVTC) that are at different levels of the corporate hierarchy (given that PGSVTC is itself a subsidiary of PGC). Perhaps the indictment means that ownership of PGTIC and PGIETC is split between the two other companies (*i.e.*, PGC, and its subsidiary, PGSVTC), or perhaps it means that PGTIC and PGIETC are subsidiaries of PGSVTC, which in turn is a subsidiary of PGC. But, in all events, because two companies cannot both have "direct ownership of a majority of shares" of another company, *Dole Food*, 538 U.S. at 474, it seems clear that the indictment is *not* using "owned" in the corporate law sense when it says that PGTIC and PGIETC are "owned and controlled by [PGC] and PGSVTC." Instead, the indictment appears to be

using "owned" only in the "colloquial sense of that term"—which *Dole Food* held is insufficient. *Id*. Consequently, when the indictment alleges that PGC is "state-owned," it likewise presumably uses that term only in its colloquial sense.

Second, we note that the Government, in opposing the Pangang Companies' earlier efforts to quash service of summons, submitted evidence affirmatively asserting that SASAC's ownership of PGC was *indirect*. Specifically, the Government contended that in 2010, after a reorganization, PGC was "100 percent owned by the Anshan Iron and Steel Group Corporation, which is 100 percent owned by central SASAC." Although we do not take judicial notice of the truth of this earlier-submitted evidence concerning the Government's theory of PGC's corporate ownership, we can take judicial notice of the fact that the Government *asserted* such a theory. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001). And the fact that the Government did so further underscores the already amply-supported conclusion that the indictment's use of the term "state-owned" was not intended to speak to the corporate-structure issues that are dispositive under *Dole Food*.

**b**

In the district court, the Pangang Companies relied principally on the indictment's additional allegation that each company was a "foreign instrumentality" *under the EEA*, and they contended that this allegation was sufficient to establish their status as instrumentalities under the FSIA. When asked at the hearing on the motion to dismiss whether it disagreed with this representation, the Government said that it did not. In its subsequent order, the district court noted that there are "some differences" between the relevant definitions in the EEA and the FSIA, but it concluded that

they were "not material." The court therefore proceeded on the assumption that the indictment's allegation that the Pangang Companies were "foreign instrumentalities" under the EEA was sufficient to establish that they were instrumentalities under the FSIA.

Because the issue goes to subject matter jurisdiction, we are not bound by the Government's failure to object below to the Pangang Companies' argument on this score. *See Stock West, Inc. v. Confederated Tribes of the Colville Rsrv.*, 873 F.2d 1221, 1228 (9th Cir. 1989) ("[A] party cannot waive by consent or contract a court's lack of s*ubject matter* jurisdiction."). Considering the jurisdictional issue independently, *see Herklotz v. Parkinson*, 848 F.3d 894, 897 (9th Cir. 2017), we conclude that the allegation that the Pangang Companies are "foreign instrumentalities" under the EEA, without more, is insufficient to trigger applicability of the FSIA.

As noted earlier, one of the elements of the charged offenses under the EEA is that the defendant must have acted "intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent." 18 U.S.C. § 1831(a). The indictment asserts that this element was satisfied because the defendants knew that the charged offenses "would benefit a foreign government, namely the PRC, and *foreign instrumentalities*, namely [PGC], PGSVTC, [PGTIC], and P[G]IETC" (emphasis added). The EEA expressly defines the term "foreign instrumentality" to "mean[] any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government," 18 U.S.C. § 1839(1), and so the indictment

necessarily alleges that each of the Pangang Companies met this definition.

On its face, however, the EEA's definition of "foreign instrumentality" is much broader than the FSIA's definition of "agency or instrumentality a foreign state," as construed in *Dole Food*. In particular, the EEA's definition is satisfied if the "corporation" is "*controlled*" by the foreign government, *see* 18 U.S.C. § 1839(1) (emphasis added), but *Dole Food* expressly rejected the view that "control may be substituted for [the] ownership interest" required by the FSIA's definition of covered instrumentalities. 538 U.S. at 477; *see id.* ("Control and ownership . . . are distinct concepts."); *see also* 28 U.S.C. § 1603(b)(2) (requiring that a "majority" of "shares or other ownership interest" be "owned" by the foreign state or its political subdivision). And unlike the FSIA's definition, the EEA's does not mention "shares" or other similar corporate formalities. *Cf. Dole Food*, 538 U.S. at 474 ("The language of § 1603(b)(2) refers to ownership of 'shares,' showing that Congress intended statutory coverage to turn on formal corporate ownership."). Instead, a company falls under the EEA's definition merely by being "*substantially* owned" by the foreign government. 18 U.S.C. § 1839(1) (emphasis added).

Because the EEA's definition of "foreign instrumentality" sweeps so much more broadly than the FSIA's definition of "agency or instrumentality of a foreign state," the indictment's allegation that the Pangang Companies satisfy the former is insufficient to establish a prima facie case that they meet the latter.

## IV

For these reasons, the allegations of the indictment, standing alone, are insufficient to establish that the Pangang

Companies were instrumentalities of the PRC on the date they were indicted.  Because the Pangang Companies relied solely upon the indictment's allegations, and presented no evidence to support their motion to dismiss, they necessarily failed to establish a prima facie case that they were "foreign state[s]" entitled to immunity under § 1604 of the FSIA. Their motion to dismiss was therefore properly denied.

**AFFIRMED.**